170 F.3d 957
 99 Cal. Daily Op. Serv. 2195, 1999 Daily
Journal D.A.R. 2890,
1999 Daily Journal D.A.R. 4219
Clayton CROFTON, Plaintiff-Appellant-Cross-Appellee,
v.
Jane ROE; Domingo Ocanaz, Defendants-Appellees-Cross-Appellants.
 Nos. 97-35121, 97-35140.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 18, 1998.
Decided March 26, 1999.
As Amended May 5, 1999.
 
 Michael W. Gendler, Bricklin & Gendler, LLP, Seattle, Washington for the plaintiff-appellant-cross-appellee.
 Colleen B. Evans, Martin E. Wyckoff, and Daniel Judge, Assistant Attorneys General, Olympia, Washington for the defendants-appellees-cross-appellants.
 Appeal from the United States District Court for the Eastern District of Washington Lonny R. Suko, Magistrate Judge, Presiding. D.C. No. CV-95-03142-LRS.
 Before: GOODWIN, SCHROEDER, and BEEZER, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 
 1
 Clayton Crofton is a Washington State prisoner. He filed this action pro se and obtained an injunction against Washington Prison officials. The injunction bars enforcement of a Washington Prison Regulation that prohibits the receipt by a prisoner of any book, magazine, or other publication, unless the prisoner ordered the publication from the publisher and paid for it out of the prisoner's own prison account. The district court granted injunctive relief because the regulation bars future gifts of publications. It denied Crofton's claim for damages because Crofton had eventually received the gift publication, the delay of which prompted Crofton to bring suit. The district court also held that even if Crofton had suffered damages, the defendants were entitled to qualified immunity. The district court upheld the prison's policy of diverting all packages, including publications, to the property room for inspection and the policy requiring books to be purchased from the publisher. It denied Crofton's request for additional discovery.
 
 
 2
 The state appeals and Crofton cross-appeals. We affirm in both. The district court properly held that the state of Washington has failed to show that the prison's blanket prohibition of gift publications, even publications sent directly by the publisher, is reasonably related to any valid penological objective. See Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). It also correctly held that Crofton's other claims lack merit.
 
 
 3
 The regulation in question is WSP Field Instruction 450.100, Procedure H.1, which became effective during the course of this litigation but apparently reflected an earlier unwritten policy. It provides:
 
 
 4
 Inmates may receive books, newspapers, magazines, and other publications directly from the publisher provided they:
 
 
 5
 a. Are paid for in advance by the inmate;
 
 
 6
 b. Do not constitute a threat to the order and security of the institution;
 
 
 7
 c. Are not obscene or sexually explicit as defined in this field instruction;
 
 
 8
 d. Are not a threat to legitimate penological objectives; and
 
 
 9
 e. Do not exceed authorized storage allowances.
 
 
 10
 The policy forms part of a broader prison policy prohibiting most gifts and requiring prisoners to purchase from their prison account all items they receive while they are in prison, except for a small number of gift packages limited to certain items of clothing. This suit was prompted by a prison official's initial rejection in 1995 of a book, Whisper of the River, sent to Crofton from the University of Washington Bookstore and ordered by his stepfather as a gift. Although that book was eventually delivered to the plaintiff, Crofton's stepfather wanted to order more books, but the prison regulations prevented him from doing so. The state unsuccessfully argued in the district court that the case is moot, but has abandoned that contention on appeal.
 
 THE STATE APPEAL
 
 11
 It is well settled that the First Amendment protects the flow of information to prisoners; any limitation must reasonably relate to a legitimate penological interest. See Turner, 482 U.S. at 89-90, 107 S.Ct. 2254; see also Thornburgh v. Abbott, 490 U.S. 401, 407-08, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); Bell v. Wolfish, 441 U.S. 520, 545, 550-51, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). We look at four factors to determine whether a regulation reasonably relates to a legitimate penological interest. See Turner, 482 U.S. at 89-90, 107 S.Ct. 2254. First, a rational relationship must exist between the regulation and the proffered legitimate governmental interest. See id. Second, we examine whether inmates have available alternative means of exercising their asserted rights. See id. at 90, 107 S.Ct. 2254. Third, we consider how accommodating the asserted constitutional right would affect guards, other inmates, and the allocation of prison resources. See id. Fourth, we look at whether the prison can easily serve its interests with alternative means without infringing upon the rights of prisoners. See id.
 
 
 12
 In her affidavit before the district court, the warden asserted that the policy barring prisoners' receipt of gift publications furthers several interests. These include the prevention of contraband coming into the prison through monitoring the source of all materials mailed to prisoners and insuring the efficiency and effectiveness of the prison mailroom for handling and searching packages. The warden also stated the policy addressed concerns about fire hazards and space requirements. Finally, in what the district court said was the most reasonable argument, the warden maintained that if inmates were allowed to receive gift publications, inmates could strike deals within the prison and demand that friends or family members send books in lieu of cash payments. If the friends or family of an inmate did not comply, the inmate's family or friends could suffer retaliation. This is a practice commonly known as "strong-arming."
 
 
 13
 The state did not offer any evidence that it had actually experienced any of these problems in connection with gift publications. Nor did the state attempt to explain in what way publications, by any particular characteristics of their own, threaten security or contribute to other problems the state asserts the regulations are designed to avoid. Indeed, the only evidence in the record of any problem stemming from items sent to prisoners was a reference to a ball of yarn that had been laced with drugs, even though the yarn had been ordered by the prisoner from a prison account and came from an authorized vendor.
 
 
 14
 The district court cogently explained why it found each of the interests allegedly furthered by the policy to be unavailing. First, the court found that prohibiting gift publications does not reasonably relate to legitimate concerns about fire hazards and storage space, because other prison regulations limit the number of books an inmate may possess. Second, the court found that the regulation does not reasonably relate to the valid penological interest in the prevention of contraband, because the prison offered "no rational distinction between the risk of contraband if an inmate orders a publication directly from the publisher or if an inmate's family member orders a publication directly from the publisher." Third, the court rejected the state's position that a complete prohibition on gift publications is necessary to ensure the efficiency of prison operations, because the prison could instead regulate the number of gift publications that inmates could receive. The court also observed the prison had placed no limit on the number of publications an inmate could order so long as storage limitations were not exceeded. Finally, the court rejected the state's position that the regulation reasonably relates to the legitimate penological concern of strong-arming. The court noted that the state offered absolutely no specific facts or explanation to support its argument. Moreover, the court found the state's argument weakened by its allowance of family and friends of inmates to send money, a practice which also raises strong-arming concerns. The ability of persons on the inmate's visiting list to send gift packages and money, but not constitutionally protected publications, also troubled the court.
 
 
 15
 On appeal, the state defends the regulation only on the grounds that it inhibits contraband and strong-arming. The state stresses the warden's contention that it is necessary for the prison to monitor the source of all items coming to the prisoner. Yet the state does not explain how requiring prisoners to pay for the items from their own accounts furthers such a goal when prison regulations also demand that publications originate with the publisher.
 
 
 16
 The state emphasizes on appeal that the overall ban on gifts is not limited to publications, but prohibits receipt of nearly every item that prisoners do not purchase from their own account. This, however, cannot constitute a justification for limiting receipt of materials protected by the First Amendment. The issue is not whether an overall restriction on other gift items is legitimate. The Supreme Court's decisions instruct that the issue is whether there is a penological justification for the restriction on First Amendment rights.
 
 
 17
 Thus, in Bell v. Wolfish, the Supreme Court considered a policy, far less restrictive than the one at issue here, that limited prisoners' receipt of hardback publications to books which came directly from the publisher. See 441 U.S. at 549, 99 S.Ct. 1861. The Court held that the policy was reasonably related to legitimate penological interests because of the prison's concern about contraband concealed in hardback books and the burden on prison officials to remove the covers to make sure that contraband was not hidden. See id. at 550-51, 99 S.Ct. 1861.
 
 
 18
 In Thornburgh, the Court upheld a policy that prisoners could receive all subscription publications except those particular publications that prison officials determined, after individual review, had content that undermined security. 490 U.S. at 404, 109 S.Ct. 1874. The rule in Thornburgh, which was much narrower than the rule presently before us, was justified by the need to prevent prisoners from receiving limited kinds of information. See id. at 416, 109 S.Ct. 1874.
 
 
 19
 Here, although the state has had ample opportunity to develop a record, it has offered no justification for a blanket ban on the receipt of all gift publications, nor has it described any particular risk created by prisoners receiving such publications. In sum, the state has shown no rational relationship between the policy and the legitimate penological objectives that it has asserted. Under the First Amendment, this is what the state must do to justify the restriction. The injunction must be affirmed.
 
 CROFTON'S CROSS-APPEAL
 
 20
 The district court denied Crofton punitive and compensatory damages because Crofton had not shown that he had suffered any damages. The district court further held that even if Crofton had established damages, the individual defendants were entitled to qualified immunity. Crofton does not challenge the district court's conclusion that he has suffered no damages, although he disputes that the individual defendants should benefit from qualified immunity. Because we conclude that Crofton has not shown any damages stemming from the ban on gift publications, we need not reach the qualified immunity issue.
 
 
 21
 Crofton did not adequately raise below his argument that the defendants violated his due process rights by failing to provide him notice of book packages sent to him. Because we generally do not consider arguments that were not raised below and because this new issue is not purely legal, we refuse to entertain it. See Resolution Trust Corp. v. First Am. Bank, 155 F.3d 1126, 1129 (9th Cir.1998); Abex Corp. v. Ski's Enters., Inc., 748 F.2d 513, 516 (9th Cir.1984); Rothman v. Hospital Serv. of S. Cal., 510 F.2d 956, 960 (9th Cir.1975).
 
 
 22
 Crofton also argues that the prison officials have violated his statutory right to freedom from interference with mail delivery under 18 U.S.C. § 1702, which criminalizes the obstruction of correspondence. Section 1702 does not apply in the prison context. See Adams v. Ellis, 197 F.2d 483, 485 (5th Cir.1952). We agree with the district court that the temporary delay in the delivery of Crofton's publications, resulting from the prison official's security inspection, does not violate his First Amendment rights. The policy of diverting publications through the property room is reasonably related to the prison's interest in inspecting mail for contraband. See Sizemore v. Williford, 829 F.2d 608, 610 (7th Cir.1987) (emphasizing that "merely alleging an isolated delay or some other relatively short-term, non content-based disruption in the delivery of inmate reading materials will not support ... a cause of action grounded upon the First Amendment").
 
 
 23
 Crofton also challenges the district court's denial of his Rule 56(f) motion for a continuance. He seeks to depose a mailroom employee in order to determine that the prison's publisher-only rule is an "exaggerated response" to prison security concerns. Crofton has not shown that the application of the publisher-only rule has ever hindered his receipt of publications. The district court properly denied this motion.
 
 
 24
 Finally, Crofton claims that prison officials are in contempt of Magistrate Judge Suko's injunctive order. He has presented no such evidence but merely avers that the officials currently prohibit gift publications for other inmates. This is an insufficient basis on which to conclude that the officials are in contempt.
 
 
 25
 AFFIRMED.